My name is Fred Koslow and I'm here representing the Bangor police officers Donnell, Betters, Coon, Farrar, Blanchard. We're appealing the District of Court Maine's decision on the partial denial of summary judgment and we're here on an interlocutory appeal on the question of qualified immunity. By the way, do you happen to know whether the district judge reviewed the videotape? Oh, the district judge's opinion doesn't say one way or another. It just says on my independent review. I do not know, Justice Singel, whether he reviewed that or not. Okay, thank you. To begin with, of course, because we're here on questions of law, the defendant accepts the factual findings of the trial court on this appeal and knows this is a de novo review on the issues of law. That's only if there are no disputed facts. The two lower court judges found that there were disputed facts, at least one of which reviewed the video. All three members of this panel have also reviewed the video as the Supreme Court told us we had to do. So just take that as the background. Your opponent says that you're offered to stipulate, if you will, that only 66 seconds were involved between the removal of the weight from the prisoner who died following this police encounter. It does not accurately represent the facts. And the magistrate judge viewing the video also specifically found that a jury could find there were facts in dispute. So your attempt to create a pure issue of law is problematic if we do not agree with you that the record clearly demonstrates that the time involved was no more than 66 seconds. Well, the magistrate found in his ruling that when Officer Vedders did the punch, that's the point that we utilized for the 66 seconds. I'm not so sure I read it the way you do, but go ahead. That's how I read it, that he was doing that in an attempt to gain compliance, and I believe that is consistent with the videotape, that he's still struggling at that moment. And so that's our position, is that we use that time interval, and the argument, of course, as you know, ultimately is the momentary continuation of the force, because we know that the court up until the point in time where he ceased resisting, wherever that happens to be. You know the Seventh Circuit case that says merely because a defendant in police custody, I think in that case, on the ground, is still moving, doesn't mean that the police don't have him already in restraint. Well, they did have him in restraint, but he still had the ability in looking at this particular individual, his state of mind and all that, he still had the opportunity to bite, spit, he had other... But that's why, is it two officers end up sitting on his chest and his neck? And protect him from himself, of course. You know, he had already exhibited some types of behavior. He jumped over a balcony, he did other things that would indicate he ran through traffic that was a risk to himself, and a risk to himself for banging his head. I mean, these were all reasons. I'm sorry, I did not pick that up from your paper. They continue to sit on him because he's a risk to himself, even if he's restrained? I think these are things which go to the reasonableness of belief of the officer. Okay, all right. What about the fact that he says to the officers, I'm having trouble breathing? He says that twice, and they apparently don't change their behavior. Well, as you would know, they indicated that depending on the degree of force, they were either using more or less weight. So, you know, I think you can see... What do you mean by that, that they were using either more or less weight? I don't understand what you mean. Well, the way the police... I mean, there's no... Well, most of the video, there doesn't seem to be any sort of modulation in the force. They're either... These two very large men are sitting on him. Well, they have a stack. But they do move, you know, from one side. It doesn't require a great deal of movement to shift weight from being one portion of your body to another. So it's not, you know, overt motion. But they clearly do. And when we went back to looking at the constitutional question, the way the court, this momentary use... What would permit you to characterize the time involved as momentary? I mean, momentary literally means, I guess, a moment in time. What we're talking about, even by your calculation, is 66 seconds. Is that what you're saying is momentary, 66 seconds? Well, we don't know that. That's the outside. Looking at the light most favorable to the plaintiff, the most that it could have been, because we know at the 66-second interval, at least from what Judge Nielsen said, about the punch was used to essentially assist in restraining him. So if that's the outside edge, it doesn't necessarily mean that that's when it happened, but sometime in that. But there has to be a time period for the officer to appreciate that, you know, there is a cessation of the struggle, of the resistance. In this case, as you remember, one of the facts that he found was earlier in the struggle, when he was tased and asked to give his hand. When he took his hand out of his body, essentially in an act of partial compliance, when that happened, he began to resist again, essentially feigning, if you will, compliance. And having done that once, it was certainly reasonable to assume that simply being motionless does not indicate to the officer that that's ended, particularly when he's on drugs. Is this a wave of drugs? Is he resting to regain his strength? Is he feigning this? Those all things have to come in, and this is all happening. So when you look at the 66 seconds, that's the maximum time that it could be. But at the same time, there's a lot of things that have to occur in there, and you can't look at that without looking at the prior behavior that he had done. So if you take your opponent's argument and sort of add the time up, it could be four or five minutes that this guy was under some form of police attempts to stop him from moving. Okay. Hypothetically, except four or five minutes rather than 66 seconds, are you then entitled to a legal determination that any reasonable officer would, for four or five minutes, have continued this pressure on him? If you look at what his activity was, he injured an officer. Answer me yes or no, please. Assume four to five minutes. Assume four to five minutes where he is completely motionless? No. On this record, assume that your 66-second count is wrong, that the period of time is more like four to five minutes. Four to five minutes? Yeah. I think based on the record, looking at all the facts, I think it's still reasonable conduct. Okay. Because you can't divorce what happened from what's on the ground. That's a fair argument, but you now told us that it doesn't depend on your 66-second analysis. Even if it were four to five minutes from the point of view of a reasonable officer, that's acceptable? The court has already determined that everything up until the 66 seconds was reasonable, so that part we've gotten summary judgment on. Where is that statement about 66 seconds? I don't find that anywhere in the magistrate judge's decision. He doesn't give the time frame. What he does is you have to correlate the video to what he says in his order, and he does say that at the time when Officer Blanchard struck him, it was to gain compliance, and if you look at the videotape, it's consistent that he's resisting at that point in time. The overt actions of resistance beyond that time on the video itself are not there, but that's the last one. He does mention that in his order at that point in time because he was kicking at that point in time. So he's still resisting at that point, and the judge was saying that sometime thereafter he may have ceased resisting. But at that point, because we got summary judgment up until the point of the cessation of resistance. Counsel, I'm just looking at Judge Nimison's words. He says, at a minimum, in this case, whether and at what point he was subdued and no longer resisting. I don't see in his analysis that he identifies, as you seem to suggest, a point at which he stopped resisting, so that then you can say, okay, he stopped resisting. How much longer did the officers exert, maintain what seemed to be a force on him? He does not identify a point. He says that's a matter of dispute. But I think what he's looking at then at the end of the thing is the last portion of the video, that last portion, because he granted summary judgment motion as to the point of him resisting. So he would absolutely have to determine at what point we got summary judgment motion up to that point. He had to have a point in mind to give a summary judgment up to a certain point. And that point is, he says, while he was resisting. And there's evidence of resisting at that particular moment on the video. Counsel, your brother in his brief says, before you even start watching the video from car 22, they had him on the ground. The video comes in at some point after he's already on the ground. And that it is possible a jury could conclude that he really wasn't seriously resisting until the other people show up. That's an argument he makes. So in fairness, what's your response? He's, A, not completely restrained at that point in time. No, but you admit he's down on the ground. So he's down by his own volition at that point in time. He is on the ground. There's no evidence that anybody sat on him at that point in time. Were there people, police, with him before the car 22 video starts? There were police with him. Right. There were police, but there's no evidence in the record that there was any. The excessive force the court was looking at is the weight that was placed. And there's no evidence, and I don't think the plaintiff even argued that there was a weight. And at that particular time, he's restrained. We're in a whole different factual framework at that point in time. I mean, we have somebody threaten to kill an officer, and the injury to the officer happened thereafter. So, you know, at that point in time, just to speculate, well, you know, they might have had him on the ground. There's no really record to support that any of that occurred. He's not restrained at that point in time. And obviously, he was resisting. He was running from the police when that happened, and he got on the ground by his own volition. Well, the magistrate judge's reasoning does not rely on that reasoning. It relies on reasoning about what it saw on the videotape, not before the videotape starts. Well, right. He's relying on the videotape. Excuse me, but he certainly relies on the video, but he says that, in other words, the record, including the video recording of the incident, are there, what he suggests is, other material in the record that indicates there are disputed facts. What beyond the video might the district court be referring here? I think he may have been just referring to the statements of material fact, you know, and the posts of the accusations. Weren't there affidavits from various people or depositions? There were affidavits, but really none of them were really, I don't think any of those are particularly germane to this case. I mean, one of the affidavits was the medical, the plaintiff's medical expert who differed from the coroner, but, I mean, we're not really at that point in time. So, and those affidavits, of course, were objected to, and I don't really think they form the basis of Magistrate Nibbett's decision. He seems to form those from the videotape and the statements of material fact. Thank you. Thank you. Good morning, Your Honor. David Van Dyke for the State of the Seaton Film Acute. Just, if I can just address a couple of questions the court had raised to Mr. Coslow. There actually, and I don't know if the court had a chance to review all of this, but there's actually a second video. There was a car 16 video, which was the automobile of Officer Blanchard. If the court may recall, what happens is after Mr. McHugh runs into the street, and he's actually in front of the Farrar and Kuhn pair in a cruiser, and either falls or trips or is brought down at the curb on Main Street next to the Central Police Station of Bangor, Fire Station of Bangor, the first vehicle there after Kuhn on either side of the road was the Blanchard vehicle, which is number 16. It's a somewhat longer video, and at large measure, it's obstructed by a fire truck. But if you reconstruct as best you can the amount of time involved in Mr. McHugh being on the ground, taking the testimony of deposition of Mr. Bedders, of Mr. Blanchard, of Kuhn, Farrar, and Dunnell, as well as Ryan Jones, who's a non-charged 6th officer, Thomas Albany, our expert, also working with Mr. Hile, indicated it could be as long as 4 minutes and 25 seconds. And that's using the testimony of the officers as to what happened both prior to and subsequent to the case. What took 4 minutes and 25 seconds? From the point of the arrest, quote-unquote, until he's picked up at 203 of the video, 22-car video, like a rag doll picked up unconscious and taken to the side of the vehicle where CPR commenced. That's up to 4 minutes and 25 seconds. And that is drawn from the testimony at deposition of the 5 officers from the car 16 video, which is the one obscured by the fire truck, which is before in time the arrival of Mr. Bedders. Mr. Bedders is the last one to arrive. He's the one who's not on the body. He's the one who's walking around. He gets the dog leash for Officer Donnell when they want to restrain his legs into the five-point restraint. So if you add all those times up, it's 425. And what's important to recognize is throughout that time. I need a little bit more point of clarification. Sure. 425 when he was on the ground before the second video picks up? No. The total amount, as best we can discern, from where he's down, falls down on Main Street in Bangor, until he's picked up sort of like a rag doll. If you know from the video, that's a 203, 2 minutes and 3 seconds of the 22 video. That's 4 minutes and 25 seconds as best we can discern. You can't tell what's going on for the first 2 minutes and 20-odd seconds because you can't see what's happening behind the fire truck on the car 16 video. He's clearly on the ground. We know from deposition that after he grabbed his arms, there's a tase, and then there's some cue and fire of the two young officers going on each side of his back while he's pulling out on the ground. They force his hands up. They handcuff him. That all happens before the veteran's vehicle arrives and the 22 video commences. That's all before that. Now clearly you see him bucking and flopping and kicking. How much of that is resistance? And how much of that is a man who's been crushed to death trying to exhale carbon dioxide? He dies of hyper-metabolic acidosis because he can't discharge. He's flatlined for 9 minutes before they induce a heartbeat on his way to his main medical center. He's dying of crushed asphyxia basically. He can't exhale the carbon dioxide. It's sort of like if someone says, how long do you hold your breath under water? You can probably hold your breath for 45 or 50 seconds. But if someone sneaks up behind you and you're in the water and they push you down and you're not expecting it and you're crashing around trying to get air, trying to get breath, that's what we're exhibiting here. He says, my heart hurts. You're hurting my heart. I can't breathe. Maybe you're answering this because of what Andy apparently said. But what in clearly established law would require the officers under the circumstances we have here to distinguish between thrashing that is resistance to what's being done and thrashing that is symptomatic of a serious medical condition? What allows us, what in the law would permit us to conclude that they had fair warning, that they had to make that kind of distinction under the circumstances we have here? If I could just add, there were also a few well-placed FUs interspersed during the thrashing that the officers heard. And, Your Honor, I, with all due respect, if I was being crushed to the point of death, I might be using some bad language myself. He was being crushed to death. But that was tied into Judge Lopez's. Absolutely. Put the reasonable. I can answer the question two ways. I can answer the question the way that Mr. Nicholson answered it. Or I can answer the way that I argued it. Both of which I'm happy if the court accepts either or both. Justice Nicholson says that the use of these techniques per se, you know, the hog tie or the wink on a prominent individual's back and shoulders for spending a period of time, Nicholson says when neither one of those are per se, this circuit has not held those to be per se objectionable, unlike Ryan. This case is a lot about the technique that Ryan used. Yeah. And he says that what makes it important here is once you have a cessation of resistance, it's subjectively, in a matter of law, a violation of the Fourth Amendment. That's how he answered that question. I would answer it a different way, although I'm perfectly happy if this court accepts Justice Nicholson's perspective. I would say the following. There's five officers. One officer's trained in Vermont. That's Blanchard. Four officers trained in Maine at the Maine Criminal Justice Academy Basic School. If you look at Paragraph 212 of the Statement of Facts, during deposition of the Maine Criminal Justice Academy, we are told, they teach their basic school students it is unreasonable to put prolonged weight upon back and shoulders. You must do what's reasonable. It's not reasonable to do that. That's Paragraph 212 of the Statement of Facts. In addition, Mr. Blanchard. That's your fair warning point. That's my fair warning, although Justice Nicholson doesn't reach that. He doesn't have to. The other piece is that Blanchard was trained specifically that you can't do that. And that's in the part of the recommended decision that talks about training. I think it's page 9 or 10. So that's how that is met. Even though this circuit has not specifically adopted Champion or Drummond or Weigel or Cruz, they were trained on it at the Maine Criminal Justice Academy in terms of, if you look at Paragraph 212, you'll see that. Blanchard was directing at the Vermont Basic Rule. So I don't care if the Court adopts Mr. Nicholson's perspective or my perspective. The Court reaches the same conclusion, I think, either way. The other question here is... Why would we ever come up with a per se rule on this excess weight? Why wouldn't it always be a matter of fact? I was sloppy in my speech. Judge Nicholson used the term per se, saying that there is no per se rule, that as of September 12, 2012 was a result of some decision of this Court. That is true. It's always going to be a weighing of perspective. Well, I can see maybe a per se rule that the police can't strangle a person to death. But this is a vastly different situation. Well, as you note in your dissent in Jennings, you have to have an individualized perspective on all of these cases. I knew you'd get Jennings in somehow. But remember, it's a dissent. It is a dissent. The majority... The Court was right then, and I think that the Maine Court was correct in the underlying case here. The point is, if you show this video in 16 and read the depositions to 10 people, there are 10 people who are going to put it in a different place when did the resistance terminate. It could have been at 134 when he goes, uh. And the last verbalization, the last muscular movement at 134 is him saying, uh. It might have been nine seconds before that when he says for the last time, you're hurting me. It might have been when he reflexively kicks Mr. Blanchard. Is that resistance? Or is that, this man is being crushed to death. He's trying to get some air. That's 66 seconds. It might have been four minutes and 25 seconds prior to the being picked up dead. The point is that it's a jury question that's preclusive of summary judgment. And I might add, Your Honors, I think it's preclusive of jurisdiction for the Court to hear the interlocutory appeal. Your Honors have laid out pretty clearly in Valdezano-Garcia that you have to have a question of law on the qualified immunity issue to get to an interlocutory appeal at all. So on that. Well, your opponent agrees with that. That's why they're, that's why they're insisting that they acknowledge we have to view this evidence in the right way so we can view it. They don't quarrel with that. There are all kinds of odd motions that get around the question of a, of a question of fact. Ultimately, when did he cease resistance? And what was the extent of force on him at that moment and in the very next moment? That's a factual question that Judge Newsom couldn't answer. Judge Singleton couldn't answer. And I suspect if you've all reviewed the video, you might, each of you three have a different point in time when resistance ceased. That's a jury question, Your Honors. In this case, you proceed to jury. And unless there's further questions, I will, I will sit down. Yeah. Thank you very much. Thank you, Your Honors. Okay. The court will take a brief recess.